1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BYRL FATEI JOHNSON,                        No.  2:14-cv-643-KJM-EFB P

12              Petitioner,

13        vs.

14   R.T.C. GROUNDS, Warden,                     FINDINGS AND RECOMMENDATIONS

15              Respondent.

16

17        Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on February 16, 2012, in the Solano County Superior Court (No. VCR204879) on

20   two counts of committing lewd acts upon a child under the age of fourteen years, with findings

21   that there were multiple child victims, one prior strike conviction, and one prior serious felony

22   conviction.  Petitioner seeks federal habeas relief on the ground that his trial counsel rendered

23   ineffective assistance by allegedly failing to investigate and present a voluntary intoxication

24   defense or present expert testimony that petitioner does not fit the profile of a child molester.

25   Upon careful consideration of the record and the applicable law, it is recommended that

26   petitioner's application for habeas corpus relief be denied.

27   /////

28   /////

1

# I.     Background

In its unpublished opinion affirming petitioner's judgment of conviction, the California Court of Appeal for the First Appellate District provided the following factual summary of the evidence presented at petitioner's trial:

## BACKGROUND

Eight-year-old M.R. and six-year-old B.H. were best friends and neighbors at the time of the relevant events. Jamie J. is M.R.'s mother. Her boyfriend, Ken, is Johnson's nephew.

On the afternoon of June 14, 2009, Jamie and Ken took M.R. and B.H. to a barbecue at the home of Johnson's friend, Patty. The barbecue lasted late into the night. The adults, including Johnson, watched the NBA playoffs and drank. The girls were jumping around and acting rowdy, "Just, you know, just doing silly things."

The girls wanted to spend the night at Patty's house, and Jamie agreed. By the time Jamie and Ken went home around midnight, Johnson had gone upstairs to bed. Jamie assumed the girls would sleep downstairs in the living room. From this point the witness accounts diverge until Jamie and Ken returned to pick the girls up the next morning.

### M.R.'s Testimony

M.R. was 10 years old at trial. She testified that she and B.H. spent the night of the barbecue in Patty's room with Patty and Johnson. The girls slept "in the end of the bed." She wore her underwear and a big t-shirt to bed because she did not have pajamas with her.

When M.R. and B.H. woke up the next morning, Patty was gone and Johnson was still asleep. The girls woke Johnson up by jumping on the bed. Then Johnson touched M.R. beneath her shirt "on my chest" and "down on my private part." He rubbed his hand all over her chest. Johnson rubbed B.H.'s chest too, but M.R. did not remember whether his hand was underneath or on top of B.H.'s clothing. Johnson touched the outside of M.R.'s panties, but not underneath them.

On cross-examination, M.R. said she and B.H. slept on the bedroom floor and Patty and Johnson slept in the bed. Johnson was angry when the girls woke him up. Initially, M.R. testified that Johnson pulled her leg to make her lie down on the bed and then touched her, but she also testified that she decided to lie down because she was tired. Then she said "it was something around there that somebody pulled my leg and I fell down," but she did not know who the "somebody" was. Then she again said she was tired so she lay down next to

Johnson, but also that somebody pulled her down, and then "I laid down because I was tired."

Johnson rubbed M.R.'s chest and "tummy" and touched her between her legs. In an earlier interview at the Rainbow Center, M.R. said Johnson only touched her tummy and chest, not anywhere else. At trial, she testified that he also touched her "near my legs" and that she told this to the man at the Rainbow Center. While defendant was touching M.R., B.H. was still jumping on the bed. M.R. pulled Johnson's hand away and moved farther from him, but he "scooted closer" and started to rub her all over. Then B.H. pulled M.R. up, and the girls went downstairs. Later, they went back and jumped on the bed some more before they left again to go downstairs to the kitchen. Johnson came downstairs and made them chicken soup, then he went back upstairs. M.R. and B.H. returned to Johnson's room and started lighting matches he gave them to play with. They also played marbles with Johnson.

### B.H.'s Testimony

B.H. was eight years old at trial. She and M.R. slept on the floor at the end of the bed. When they woke up in the morning, Patty had already left for work. The girls got up and jumped on the bed. Johnson woke up and "pulled us down and started touching us in private places." He touched M.R. "[o]n the sides near her private area," but nowhere else. He touched B.H.'s chest, but not M.R.'s. Johnson touched the girls under their long t-shirts but did not put his hand inside their panties. B.H. pulled Johnson's hand as he was touching M.R. and the girls ran off and started playing on the stairs.

Later, M.R. and B.H. went back into the bedroom and jumped on the bed some more. Johnson woke up and told them to get off, but instead the girls sat on the end of the bed. He did not make the girls breakfast or soup. B.H. did not remember playing with matches and did not know whether or not she did.

### Jamie's Testimony

When Jamie and Ken arrived to pick them up the next morning, the girls rushed to the door looking frantic and scared. They said Johnson had played with M.R.'s chest, patted her private parts, and put his thumbs between her leg and vagina.

Johnson was upstairs in the bedroom. Patty was still at work. Jamie and Ken spoke with Johnson, then stayed at the house until Patty came home in the early afternoon. The girls repeated their story to Jamie and Patty, and later at home Jamie continued to talk to them about the incident. Throughout the day, the girls remained adamant about what Johnson did to them.

That evening Johnson came to Jamie and Ken's home. At one point Ken went outside, and Jamie had a private conversation with Johnson while sitting in

3

his lap.  Ken came in and asked Jamie why she was sitting there.  She told him it was not anything.  Jamie called the police the next morning.

### Ken's Testimony

Ken testified that he and Johnson drank "more than the limit" at the barbecue.  He did not want to believe what the girls told them about Johnson when he and Jamie returned to get them the next morning.  Johnson was upstairs on the bed, still dressed in his clothes from the previous night.  Ken could tell he "was still been drinking or feeling it from the night before."  Ken discussed the girls' allegations with Johnson that morning and again that evening when Johnson came over to his house.  Ken did tell Jamie to get off of Johnson's lap, but he was not angry about it.

The next day Ken called the police.  He also called Victoria James, Johnson's girlfriend, and told her about the alleged molestation.  Ken explained that he and Jamie "knew that [Johnson had] been doing things to [James] and this and that and figured she was upset and that she got the kids and Jamie got kids, and I was like this is what my uncle doing."  He asked James to tell the police about an incident in which he thought that Johnson had attacked James's car or house with a baseball bat, but he did not tell her to say Johnson beat her with a baseball bat, and he did not ask her to lie to the police.

Jamie and Johnson did not get along and had gotten into a couple of confrontations since Jamie and Ken started dating.

### Officer Bassett's Testimony

Vallejo Police Officer Mark Bassett was the investigating officer and attended the police interviews of both girls at the Rainbow Center in August 2009.  M.R. said that she and B.H. were jumping on the bed when she got tired and decided to lie down next to Johnson.  She never said she was pulled down onto the bed.  When M.R. was asked where Johnson touched her, she said that he rubbed her chest and tummy.  Johnson also rubbed the area between "the hem of her panty line and her thigh area," but M.R. repeatedly said he did not touch her privates or put his hand inside her underpants.  M.R. did not say that Johnson also touched B.H. during this interview, but later in a second interview she was asked whether Johnson touched anyone else.  She responded that Johnson touched B.H. while B.H. was bouncing on the bed.

B.H. told Officer Bassett she saw Johnson put his hand inside the top of M.R.'s panties and touch her "coco," the area under her panties.  M.R. smacked Johnson's hand away and said, "Don't touch me like that."  B.H. also said Johnson put his hand under her own shirt, and she slapped him.  None of the prior police reports reflected that B.H. had claimed Johnson touched her too.

*Victoria James's Testimony*

Victoria James dated Johnson between January and June 2009, but broke up with him in June because of his heavy drinking. Ken told her about the girls' accusations and told her to tell the police that he had beaten her with a baseball bat. Ken knew this was a lie. James testified that her relationship with Johnson was peaceful, but she admitted that she sought a restraining order after a violent incident in September 2009 to get Johnson out of her house and help him stop drinking.

*Johnson's Testimony*

Johnson testified that he drank heavily at the barbecue, "upwards of [a] quarter of a gallon." The next morning when he woke up he was hung over but not drunk. The girls were screaming and jumping on the bed. He screamed at them and "told them to get the 'F' off the bed," but they just laughed and kept jumping. Then he threatened to tell their parents if they did not stop. M.R. stopped, but B.H. did not, so Johnson pushed M.R. off the bed and the girls left the room. Johnson drank a shot of alcohol and continued to doze on and off until the girls came back and resumed their jumping. Johnson again responded by yelling at them and saying he would tell Jamie. B.H. told him to stop yelling at her or she would "tell on [him]." The girls left again, but a while later they returned and started striking matches against the bedroom furniture. Johnson jumped up and the girls ran off. They all went downstairs, where Johnson made the girls soup and sandwiches for breakfast. After breakfast the girls played, and Johnson showed them how to play marbles before he returned upstairs to nap and drink brandy.

Later that afternoon Patty told him about the girls' accusations. That night Johnson went over to Ken and Jamie's house. He testified: "I was crying. I was telling them, 'You know me better than that. Why would you even ask me some shit like that?'" Ken and Jamie assured him that the matter "was already squashed" and would not go any further.

Later, after Ken left, Jamie sat on Johnson's lap to console him. When Ken returned, he asked what was going on and told Jamie to "get the fuck off" Johnson's lap. Jamie immediately got up, and she and Ken "kicked [Johnson] out."

Johnson had never previously been accused of a sexual crime. He denied that he ever touched either girl's chest or private parts. He pushed M.R. because he was angry, not for a sexual purpose, and he did not touch B.H. at all.

On cross-examination, Johnson acknowledged that he never said he pushed M.R. off the bed before he testified at trial. He said that in his police interview he did not remember pushing her. He told Officer Bassett that he never "touched" M.R. because a push is different from a touch and because it is an assault that could get him in trouble. In addition, he thought the officer was only asking him about sexual touching, and the push was not of that nature.

Johnson admitted that he was convicted of terroristic threats in 2001 and vandalism in 2004. He had taken a plea bargain in "every case [he'd] ever had," but he rejected an offer of a three-year sentence in this case because he was innocent. He is not sexually attracted to children and has never before been accused of sexual or other misconduct involving children.

Officer Bassett was called by the defense as a rebuttal witness. He interviewed Johnson in September 2009. Johnson repeatedly said the girls woke him by jumping on the bed, and that he kept threatening to spank them and tell their mother unless they stopped. Johnson said he was very drunk and had passed out the night before. The girls could not possibly have misinterpreted an innocent or accidental touching because he did not touch them in any way. He specifically denied that he grabbed the girls to get them off the bed or spanked them, "because he doesn't touch children." Rather, the girls were lying.

Johnson knew Patty was going to go to work that morning, but he thought she would only be gone for 30 minutes at most.

Cal. Court of Appeal Opinion & Order Modifying Opinion ("Resp't's Ex. A") at 2-7.

The jury convicted petitioner of two counts of committing a lewd act against a child under fourteen years of age and found that he committed the offenses against multiple victims. *Id.* at 7.

Petitioner moved for a new trial, arguing in part, that his trial counsel failed to investigate and raise a voluntary intoxication defense. *Id.* The trial court denied the motion and imposed a state prison term of 35 years to life. Clerk's Transcript of Trial ("Resp't's Ex. B") at 416-418, 462-467.

Petitioner appealed the judgment to the California Court of Appeal. Resp't's Ex. A. While the appeal was pending, petitioner filed a petition for a writ of habeas corpus. Resp't's Ex. C. In the appeal and petition, petitioner contended that trial counsel rendered ineffective assistance because she failed to investigate and present a voluntary intoxication defense or present expert testimony that he does not fit the profile of a child molester. Resp't's Exs. A & C. The California Court of Appeal ordered the habeas corpus petition consolidated with the appeal. Resp't's Ex. A at 13. The California Court of Appeal affirmed the judgment and denied the petition for writ of habeas corpus. *Id.* at 19. The California Court of Appeal subsequently modified the judgment to correct a typographical error. *Id.* at 1. Petitioner then filed a petition

/////

1    for review and a petition for writ of habeas corpus in the California Supreme Court, which were

2    both summarily denied.  *See* Resp't's Exs. F, G.

3    **II.     Legal Principles**

4        **A.   <u>Standards of Review Applicable to Habeas Corpus Claims</u>**

5            An application for a writ of habeas corpus by a person in custody under a judgment of a

6    state court can be granted only for violations of the Constitution or laws of the United States.  28

7    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

8    application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

9    *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

10   2000).

11          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

12   corpus relief:

13                 An application for a writ of habeas corpus on behalf of a
              person in custody pursuant to the judgment of a State court shall not
14            be granted with respect to any claim that was adjudicated on the
              merits in State court proceedings unless the adjudication of the
15            claim -

16                 (1) resulted in a decision that was contrary to, or involved
              an unreasonable application of, clearly established Federal law, as
17            determined by the Supreme Court of the United States; or

18                 (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
19            State court proceeding.

20          For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

21   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

22   *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

23   ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.

24   Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

25   what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

26   633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

27   precedent may not be "used to refine or sharpen a general principle of Supreme Court

28   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

*v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  *Id.*  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [1]  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S.\_\_\_,\_\_\_,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

---

[1]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1    comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131

2    S. Ct. at 786-87.

3         If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4    court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

5    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

6    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

7    2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

8    de novo the constitutional issues raised.").

9         The court looks to the last reasoned state court decision as the basis for the state court

10   judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

11   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

12   previous state court decision, this court may consider both decisions to ascertain the reasoning of

13   the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

14   a federal claim has been presented to a state court and the state court has denied relief, it may be

15   presumed that the state court adjudicated the claim on the merits in the absence of any indication

16   or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85.  This

17   presumption may be overcome by a showing "there is reason to think some other explanation for

18   the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

19   803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

20   but does not expressly address a federal claim, a federal habeas court must presume, subject to

21   rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___,

22   ___, 133 S.Ct. 1088, 1091 (2013).

23        Where the state court reaches a decision on the merits but provides no reasoning to

24   support its conclusion, a federal habeas court independently reviews the record to determine

25   whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

26   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

27   review of the constitutional issue, but rather, the only method by which we can determine whether

28   a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

1   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

2   reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

3          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

4   *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

5   just what the state court did when it issued a summary denial, the federal court must review the

6   state court record to determine whether there was any "reasonable basis for the state court to deny

7   relief." *Richter*, 131 S. Ct. at 784. This court "must determine what arguments or theories ...

8   could have supported, the state court's decision; and then it must ask whether it is possible

9   fairminded jurists could disagree that those arguments or theories are inconsistent with the

10   holding in a prior decision of [the Supreme] Court." *Id.* at 786. The petitioner bears "the burden

11   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v.*

12   *Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

13          When it is clear, however, that a state court has not reached the merits of a petitioner's

14   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15   habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

16   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

17          **B.      Ineffective Assistance of Counsel**

18          The clearly established federal law for ineffective assistance of counsel claims is

19   *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant

20   must show that (1) his counsel's performance was deficient and that (2) the "deficient

21   performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or

22   her representation "fell below an objective standard of reasonableness" such that it was outside

23   "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal

24   quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a

25   fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 131 S.Ct. 770, 787-88 (2011)

26   (quoting *Strickland*, 466 U.S. at 687).

27          Reasonable tactical decisions, including decisions with regard to the presentation of the

28   case, are "virtually unchallengeable." *Strickland*, 466 U.S. at 687-90. However, defense counsel

1    has a "duty to make reasonable investigations or to make a reasonable decision that makes

2    particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Counsel must, "at a

3    minimum, conduct a reasonable investigation enabling him to make informed decisions about

4    how best to represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1035 (9th Cir. 1995)

5    (quoting *Sanders*, 21 F.3d at 1456 (internal citation and quotations omitted).

6        A reviewing court is required to make every effort "to eliminate the distorting effects of

7    hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

8    conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131

9    S.Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct

10   falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

11   This presumption of reasonableness means that the court must "give the attorneys the benefit of

12   the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

13   may have had for proceeding as they did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388,

14   1407 (2011) (internal quotation marks and alterations omitted).

15       Prejudice is found where "there is a reasonable probability that, but for counsel's

16   unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

17   U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

18   outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

19   *Richter*, 131 S.Ct. at 792.  A reviewing court "need not first determine whether counsel's

20   performance was deficient before examining the prejudice suffered by the defendant as a result of

21   the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

22   lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

23       Under AEDPA, "[t]he pivotal question is whether the state court's application of the

24   Strickland standard was unreasonable." *Id.* at 785.  "[B]ecause the *Strickland* standard is a

25   general standard, a state court has even more latitude to reasonably determine that a defendant has

26   not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

27   /////

28   /////

11

### III.   Discussion

Petitioner claims that his trial counsel rendered ineffective assistance because she failed to investigate and present a voluntary intoxication defense or present expert testimony that he does not fit the profile of a child molester, otherwise known as a *Stoll* defense.  *See People v. Stoll*, 49 Cal. 3d 1136, 1161 (1989).

### A.  Background

As noted, petitioner filed a motion for a new trial arguing that his trial counsel was ineffective.  An evidentiary hearing was held and petitioner testified about his history of heavy alcohol consumption:

> Johnson testified that he drank from three-fourths of a liter to half a gallon of 80 proof brandy a day throughout his adult life.  He regularly drank until he passed out; he explained "[t]hat's how I go to sleep."  He often woke up in vomit.  Alcohol was a factor in his prior convictions, and his parole conditions prohibited him from possessing alcohol or being in a liquor store.  From his own perspective he is never drunk, even though "anybody else seeing me would say I was drunk.  To me, I'm hungover.  I'm never drunk to myself."  That's why he testified at trial that he was hung over, but not drunk, the morning after the barbecue.  People told him he drank too much, and on many occasions he was told he did things he could not remember doing.

Resp't's Ex. A at 8.  Petitioner conceded that he never told the jury he had difficulty remembering what happened on the morning in question or that he was too drunk to understand what was happening.   Reporter's Transcript on Appeal ("Resp't's Ex. J") at 500-502.  He remained adamant that he did not sexually assault the girls.  *Id.* at 497.  However, he also stated that he had gone to bed drunk, and sought an expert to determine if he could have touched the girls without remembering because of his drinking.  *Id.* at 498-500.

The hearing on petitioner's motion for a new trial also included expert legal and psychiatric testimony.  John Mendenhall testified that he represented petitioner prior to turning the defense over to Elena D'Agustino.  *Id.* at 440-441.  Petitioner said he was "100 percent not guilty" and that he was not going to enter into any plea bargain or admit any sexual conduct with children.  *Id.* at 442.

12

The California Court of Appeal provided the following factual summary of

D'Agustino's testimony at the hearing on the motion for a new trial:

> Johnson consistently and adamantly insisted to D'Agustino that he did not
> touch the girls sexually.  D'Agustino did not remember Johnson either expressing
> difficulty remembering what had happened or saying that he remembered the
> events clearly.  The defense she presented was that the alleged events did not
> occur; either the children were lying or they did not know what they were talking
> about. Late in the trial she asked for a standard jury instruction on voluntary
> intoxication.  She thought, but was not certain, that she did so because Johnson
> requested it.
>
> D'Agustino knew Johnson was a heavy drinker, and Johnson told her he
> was intoxicated the morning after the barbecue, drank more that morning, and was
> hung over. One of the trial witnesses told D'Agustino's investigator that Johnson
> was "pretty drunk" that morning, but his trial testimony on that point was not as
> strong.  D'Agustino did not remember considering or investigating intoxication as
> a potential defense, or whether she discussed it with Johnson.  "I know that we had
> a lot of conversations about the case and conversations about, um, all the aspects
> of the case. Um, I don't specifically remember discussing [an intoxication
> defense] with him.  I don't remember one way or another.  We may have discussed
> voluntary intoxication as a defense.  We may not have.  I don't remember.  I
> looked in my file, and I did not take very good notes in this particular case, so I
> don't know."
>
> D'Agustino did not consult with a psychiatrist, psychologist or other expert
> for assistance in evaluating how alcohol could have affected Johnson's behavior;
> nor did she speak to any of his relatives or acquaintances about his drinking.  She
> did not remember why she did not present, or why she decided against presenting
> an intoxication defense.  Johnson had mentioned blacking out after drinking.
> D'Agustino was not certain, but she did not think he told her he blacked out on the
> morning of the offense.

Resp't's Ex. A at 9-10.  D'Agustino was also asked whether there were concerns in presenting

inconsistent defenses, and she testified: "The concerns are that it's presenting two inconsistent

defenses that could, um, cause a jury to disregard both of them, but it's a case by case basis . . . ."

Resp't's Ex. J at 474.

Psychiatrist Murray Eiland testified that petitioner had reported he "was a very serious

alcoholic."  *Id.* at 479.  Eiland also testified that chronic, heavy drinkers can have episodes of

"sleepwalking," during which they move and apparently function and yet are unaware of their

actions. *Id.* at 480-481.  They may also "confabulate," or create memories of things that did not

1   happen.  *Id.* at 481.  Chronic alcoholics may also experience blackouts, although not all do, and it

2   is common for them to minimize and deny their drinking.  *Id.* at 480, 487.

3      In addition, certified criminal law specialist Daniel Russo offered his expertise in the

4   adequacy of legal representation.  *Id.* at 508.  Russo testified that petitioner did not receive

5   reasonably competent legal assistance at trial and that his attorney's failings were prejudicial.  *Id.*

6   at 514.  He believed petitioner's case presented grounds for raising both an intoxication defense

7   and a "*Stoll* defense," in which expert testimony is presented to support a claim that the defendant

8   does not fit the profile of a child molester.  *Id.* at 511.  Russo said there was no valid tactical

9   reason for defense counsel not to argue both innocence and voluntary intoxication in the

10  alternative, particularly as petitioner was facing what was effectively a life sentence.  *Id.* at 529-

11  530.  In his view, a reasonably competent attorney would have both raised an innocence defense

12  and argued that, if petitioner did do it, he was so intoxicated that he lacked lewd intent.  *Id.* at

13  531.  Russo did not believe that petitioner's adamant denials of having touched the girls were

14  reason not to present an alternative intoxication defense.  *Id.* at 530-531.

15     The trial court denied petitioner's motion for a new trial, reasoning as follows:

16
17     Matter having been submitted – you know, and I read over the – over the
    weekend I reviewed some of the law that applies. . . . . Ultimately, this Court's
    duty is to decide whether or not the Defendant received a fair trial.

18
19     *Strickland versus Washington* asks whether or not a Defendant had
    reasonable effective counsel, and if not, was he prejudiced by that lack of
20  performance? To establish prejudice it must be shown that there's a reasonable
    probability that, but for the Defendant's counsel's unprofessional errors the
21  resulting verdict would have been different.

22     Defendant's articulated testimony at trial was that he recalled the events of
    the morning in question.  That he did not commit the alleged act, and stated
23  nothing about being under the influence.  Months later, when interviewed by
    police, I think at San Quentin, he gave the same story.  Last Friday, a few days
24  ago, he implied he was under the influence of alcohol.

25     This Court as well as Mr. Russo, as an expert for the Defense, he was
    sitting here while the attorneys testified.  We all heard from attorneys Mindenhall
26  [sic] and D'Agustino, and based on that testimony and review of the entire record
    Mr. Russo opined that ineffective assistance of counsel has been shown based on,
27  among other things, failure to pursue the intoxication defense; the *Stoll* S-T-O-L-L

28

defense; that the Defendant was not a molester, and the failure to pursue a 402 hearing regarding 8 and 10-year-old witnesses competent to testify in the first place. He also opined that arguing inconsistent defense would have been appropriate. . . . .

I disagree. Ms. D'Agustino acted as a reasonable, competent attorney both in preparing and investigating the case and in her performance before the jury. I have known Mr. Russo for over 30 years both professionally and personally. He's a superior trial lawyer and deserves his excellent reputation. I disagree with his opinion regarding Defense Counsel's performance and regarding the wisdom of presenting inconsistent defenses. Juries don't like it.

Regarding the Defendant's testimony, I find it self-serving and inconsistent with his pretrial and trial testimony. Even if Defendant's attorneys were not diligent advocates, the Court opines it is not a reasonable probability that a more favorable result would have been obtained in the absence of Counsel filing Defendant's motion. Motion for a new trial is denied.

*Id.* at 562-564.

### B. **Voluntary Intoxication**

Petitioner claims that trial counsel was ineffective for failing to investigate and present a defense of voluntary intoxication and its effect on petitioner's mental state. The California Court of Appeal rejected petitioner's claim, as follows:

### *II. Failure To Pursue An Intoxication Defense*

Johnson contends D'Agustino should have argued both that he did not molest the girls and, alternatively, that if he erroneously believed he did not do it, because of his chronic drinking he acted without the lewd intent required for conviction under section 288. He acknowledges that an informed decision *not* to present an intoxication defense after investigating its strengths "arguably might have withstood constitutional scrutiny." But D'Agustino conducted no such investigation. Her omission, Johnson asserts, constituted ineffective representation.

Our analysis of his claim is more nuanced than Johnson suggests. While strategic choices made after thorough investigation are "virtually unchallengeable," choices made "after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty *to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland*, *supra*, 466 U.S. at pp. 690-691, italics added.)

15

*Strickland* also cautions that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  (*Strickland*, *supra*, 466 U.S. at pp. 690-691.)

Thus our analysis does not end with D'Agustino's decision not to investigate a potential intoxication defense.  Her reasons for not doing so are unknown: she testified that she did not remember whether she considered the defense, why she did not investigate it, or why she ultimately did not present it.  Accordingly, to establish ineffective representation, Johnson must show there could have been "no conceivable tactical purpose" for D'Agustino's inaction.  (*People v. Lewis*, *supra*, 25 Cal.4th at pp. 674-675; *Strickland*, *supra*, 466 U.S. at p. 691.)  He has not done so.  D'Agustino was asked at the new trial hearing whether, for a defense attorney trying a section 288 case, there would be concerns about arguing to a jury "an absolute total denial of sexual touching with these girls," on the one hand, and "the alternative argument that, well, if he did touch them, he just didn't know what he was doing."  D'Agustino responded that the tactic could be dangerous.  She explained: "it's presenting two inconsistent defenses that could [ ] cause a jury to disregard both of them. . ." and that whether to do so must be decided on a case-by-case basis. In this case, that decision would have to take into account Johnson's adamant denials of any sexual touching, his detailed recollection of the morning's events, and his statements that he was hung over, but not drunk, that morning.

Defense counsel would also have to consider the difficulty of persuading a jury that Johnson in fact committed the charged acts and yet was too drunk to have done so with the specific intent to arouse, appeal to, or gratify his or the children's "lust, passions, or sexual desires." (§ 288, subd. (a).)  But, the very nature of the touchings as alleged by the girls permitted no explanation other than sexual gratification. (*See People v. Jones* (1954) 42 Cal.2d 219, 223 [specific intent required for section 288 conviction was necessarily present if the physical act was as the complaining witness claimed]; *People v. O'Tremba* (1970) 4 Cal.App.3d 524, 528 [same, citing *Jones*].)  To persuade the jury that Johnson could have committed the charged acts without the lewd intent required for conviction, counsel would have had to argue that Johnson was intoxicated *to the point of unconsciousness* when he rubbed the girls' bare chests and fondled them near, on or under their panties. (*See* § 29.4, subds. (a), (b) [unconsciousness caused by voluntary intoxication is not a complete defense, but can negate specific intent]; *People v. Hughes* (2002) 27 Cal.4th 287, 343-344 [voluntary unconsciousness during alcohol-induced blackout]; *People v. Ochoa* (1998) 19 Cal.4th 353, 423-

16

424 [unconsciousness can exist where the person acts, but is not conscious of acting at the time].)  But there is precious little support for such a theory in this record.  True, Johnson mentioned having blackouts in the past, but he did not report having one the morning after the barbecue.  To the contrary, Johnson both denied he was drunk when he woke up and provided a detailed description of the morning's events.  The strongest support for an unconsciousness defense is Dr. Eiland's testimony that heavy chronic drinkers can experience sleepwalking-like episodes, in which they function but are unaware of their actions.  But with no indication that this happened the morning in question, and, on the other hand, Johnson's seemingly clear recollection of that morning's events, defense counsel could have reasonably decided that the chances of prevailing on an unconsciousness theory were outweighed by the danger of weakening Johnson's claim of actual innocence.

Because the record discloses plausible tactical reasons not to pursue an intoxication defense, Johnson's claim that his trial counsel performed inadequately because she did not do so provides no basis for disturbing the judgment. (*See People v. Lewis*, *supra*, 25 Cal.4th at pp. 674-675.)

Resp't's Ex. A at 15-18.

In the instant petition, petitioner contends that trial counsel should have argued that even though petitioner believed he "'did not do it,' the profound effect of repeated and excessive alcohol consumption on petitioner's brain caused him to act without the lewd intent required for a conviction . . . ."  ECF No. 1 at 33-34.  He contends that counsel should have investigated a voluntary intoxication defense because she knew that (1) petitioner drank a lot, (2) he had experienced blackouts after drinking, (3) petitioner told her he had been drinking on the morning in question and was intoxicated, and (4) one witness had reported that petitioner appeared drunk that morning.  ECF No. 1 at 34.

Counsel's awareness of petitioner's drinking did not render her pursuit of an unrelated defense "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Although counsel knew about petitioner's history with alcohol and his use of alcohol prior to and on the morning in question, there was no evidence that petitioner was intoxicated to the point of blacking out on the morning in question.  In addition, petitioner's clear memory of the morning's events belied any claim that intoxication prevented him from forming the specific intent required for a conviction.

/////

1    Moreover, a jury could have viewed the inclusion of a voluntary intoxication defense as

2    inconsistent with petitioner's denials and testimony at trial.  Petitioner adamantly denied at trial

3    any sexual touching, provided a detailed recollection of the morning's events, and stated that he

4    was hung over, but not drunk, when the alleged touching took place.  As the trial court noted

5    following petitioner's testimony at the hearing on his motion for a new trial, petitioner's

6    suggestion that he could have been so drunk that he touched the girls without remembering,

7    appeared to be "self-serving and inconsistent with his pretrial and trial testimony."  Resp't's Ex. J

8    at 594.  Although Dr. Eiland testified that heavy chronic drinkers can experience sleepwalking-

9    like episodes, in which they function but are unaware of their actions, there was no indication that

10   the touching in this case was a result of such a blackout.  Defense counsel could have reasonably

11   decided that the chances of prevailing on an "unconsciousness" theory were outweighed by the

12   danger of weakening petitioner's claim of innocence.

13   Furthermore, as respondent points out, the record supports trial counsel's decision to

14   defend the case by denying the charges.  *See* ECF No. 11-1 at 12-13.  "There was no question

15   about the identity of the molester, there was no apparent reason for the girls to invent the

16   accusations, and there was no conflicting eyewitness testimony by other participants."  *Id.* at 12.

17   Moreover, petitioner had denied touching the girls in any way prior to trial, and did not have

18   trouble remembering what had happened when the alleged touching occurred.  Resp't's Ex. A at

19   5-7.  Like many trials involving sexual offenses, counsel reasonably determined that it was best

20   presented as a credibility contest.  *See, e.g., Vega v. Ryan*, 757 F.3d 960, 969-70 (9th Cir. 2014).

21   It is within the broad range of professionally competent assistance to choose not to

22   investigate evidence which would contradict the primary defense theory.  *Corell v. Stewart*, 137

23   F.3d 1404, 1411 (9th Cir. 1998).  Put another way, once counsel reasonably chose one defense

24   theory, her duty to investigate another conflicting defense was at an end.  *See Strickland*, 466 U.S.

25   at 691.

26   Petitioner also finds fault with the fact that "[t]he Court of Appeal completely fails to

27   explain why, if indeed counsel 'decided' not to present an intoxication defense, she later

28   successfully sought instruction on that defense, which essentially explained to the jury that

18

1    Petitioner might have acted in the prohibited manner but without the requisite specific intent."

2    ECF No. 12 at 4.  Petitioner argues that counsel should have "provide[d] the missing evidentiary

3    link to explain how and why alcohol could have negated the requisite specific intent."  ECF No. 1

4    at 39.  However, petitioner fails to point to any evidence showing that in this case, petitioner's

5    alcohol intake could have negated the requisite intent.

6         The trial record also sheds light on why counsel successfully sought an instruction on the

7    voluntary intoxication defense without also presenting that defense to the jury.  The jury was

8    aware that petitioner was under the effects of alcohol at the time of the crime, as the testimony at

9    trial showed that petitioner had "been drinking all day and was pretty intoxicated," and that when

10   "he woke up . . . he was hungover and started drinking again."  Resp't's Ex. J at 307.  The

11   prosecutor argued that an instruction on the voluntary intoxication defense was "contrary" to

12   petitioner's defense that he "didn't touch the [girls] in a sexual way at all."  *Id.*  Trial counsel

13   responded that she sought the instruction because the prosecutor would likely argue that petitioner

14   was "not telling the truth."  *Id.* at 308.  Thus, the instruction served to benefit petitioner in the

15   event the jurors chose to disbelieve him, as it explained that petitioner might have acted in the

16   prohibited manner but without the specific intent required for a conviction.  *See* Resp't's Ex. B at

17   135 ("You may consider [evidence of defendant's voluntary intoxication] only in deciding

18   whether the defendant acted with the intent of arousing, appealing to, or gratifying the lust,

19   passions, or sexual desires of himself or the child.").

20        For these reasons, the conclusion of the California Court of Appeal that trial counsel had

21   tactical reasons not to pursue an intoxication defense is not contrary to or an unreasonable

22   application of *Strickland*.  It is certainly not "so lacking in justification that there was an error

23   well understood and comprehended in existing law beyond any possibility for fairminded

24   disagreement."  *Richter*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to relief on

25   this claim.

26            C.  ***Stoll* Defense**

27        Petitioner claims that trial counsel should have consulted a *Stoll* expert in light of

28   petitioner's extensive criminal history, which did not suggest any prior sexual misconduct.  ECF

                                                19

No. 1 at 36.  Petitioner's argument relies on the report of psychologist Douglas Korpi, Ph.D., who concluded that petitioner was not a pedophile:

> Mr. Johnson is a 48-year-old man with an extensive criminal history who has found himself committed to State Prison for a period of 30 years referent to the molest of two girls, this occurring over the period of less than an hour and within the context of the Defendant likely being drunk, hung-over, and within the context of being awoken and feeling annoyed by the girls jumping on his bed.  Even if we grant that he touched both of the girls in a sexual manner, such behavior, over such a limited period of time, comes nowhere close to being a sufficient basis for a diagnosis of Pedophilia.  Indeed, the case factors in this matter all go against a diagnosis of Pedophilia.  First, there is no prior history whatsoever of sexual misconduct directed towards children in this case.  This is particularly salient given the fact that this is a man who has led a life of such wild abandon that he would have been more likely than not to have committed a prior sexual offense against a child than would the typical pedophile, what with his general lack of control.  As to the "set-up" leading to the crime, note that the Defendant did not, in any obvious way, ask the girls up to the room, lure them, or behave in any sexually provocative fashion whatsoever.  The girls came to him in all innocence and his behavior occurred within the context of his awakening from a drunken stupor.  I have been one of the Chief Consultants to the California Department of Mental Health's Sexually Violent Predator Unit for over 10 years, and none of us (there are approximately 70 psychologists or psychiatrists on this panel) would diagnose a Pedophilia.  Even more, it is often the case that we make a diagnosis of Pedophilia on a 'provisional' basis when we suspect that the instant behavior is but the tip of the iceberg.  In this case, we would not even suspect that."

Resp't's Ex. G.  Petitioner argues that trial counsel was ineffective by failing to present expert testimony indicating that he does not fit the profile of a child molester, otherwise known as a *Stoll* expert.

After the California Court of Appeal rejected this claim, petitioner obtained a declaration from trial counsel, stating that she did not consider investigating or presenting a *Stoll* defense, and that petitioner's criminal history was not a factor in investigating or presenting this possible defense.  *Id.*  Petitioner presented this declaration to the state courts for the first time in his petition for writ of habeas corpus filed in the California Supreme Court.  *Id.*  The California Supreme Court summarily denied the petition.  *Id.*  Because petitioner effectively raised a new claim by adding this declaration to the petition before the California Supreme Court, which was

/////

1 summarily denied, this court will conduct an independent review of the record to determine

2 whether habeas corpus relief is available under 28 U.S.C. § 2254(d). *Stanley*, 633 F.3d at 860.

3        Petitioner fails to demonstrate prejudice with respect to this claim.  According to

4 petitioner, "[a] jury . . . presented with relatively ambiguous and often contradictory testimony by

5 two young girls favorably could have considered the expert testimony of a well-credentialed

6 psychologist who found no evidence that Petitioner was sexually interested in children."  ECF

7 No. 12 at 5-6.  However, the jury had no reason to believe that petitioner was sexually interested

8 in children, as he testified about his extensive criminal history, including the fact that he had

9 never before been accused of a sex crime.  Resp't's Ex. J at 253.  Moreover, Dr. Korpi's

10 conclusion that petitioner does not qualify for a diagnosis of pedophilia does not preclude a

11 finding that petitioner committed the lewd acts as alleged.  To the contrary, Dr. Korpi actually

12 assumed, in reaching his conclusion, that petitioner had committed the crime as charged.  *See*

13 Resp't's Ex. G ("Even if we grant that he touched both of the girls in a sexual manner, such

14 behavior, over such a limited period of time, comes nowhere close to being a sufficient basis for a

15 diagnosis of Pedophilia.").  Thus, petitioner could have committed the acts of which he was

16 accused without also being a pedophile.

17        The *Strickland* standard "places the burden on the defendant, not the State, to show a

18 'reasonable probability' that the result would have been different."  *Wong v. Belmontes*, 558 U.S.

19 15, 27 (2009) (quoting *Strickland*, 466 U.S. at 694).  Petitioner has failed to meet that burden with

20 respect to this ineffective assistance of counsel claim.  On this record, it cannot be said that the

21 state court's rejection of petitioner's claim regarding a *Stoll* defense was contrary to or an

22 unreasonable application of *Strickland*, nor was it objectively unreasonable in light of the totality

23 of the evidence presented.  Accordingly, petitioner is not entitled to federal habeas relief on this

24 claim.

25    **IV.    Conclusion**

26        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

27 habeas corpus be denied.

28 /////

1    These findings and recommendations are submitted to the United States District Judge

2  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3  after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within fourteen days after service of the objections.  Failure to file

7  objections within the specified time may waive the right to appeal the District Court's order.

8  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

9  1991).  In his objections petitioner may address whether a certificate of appealability should issue

10  in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

11  2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

12  final order adverse to the applicant).

13  DATED:  March 30, 2017.

14  EDMUND F. BRENNAN

15  UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28